Nos. 20-MJ-2616-MBB, 20-MJ-2617-MBB, 20-MJ-2618-MBB

# AFFIDAVIT OF SPECIAL AGENT MERCEDES CASELLA IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

I, Mercedes Casella, state:

## Introduction and Agent Background

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed in that capacity since June 2016. I am currently assigned to the North Shore Safe Streets Gang Task Force in Massachusetts, which is focused on federal gang and narcotics investigations. I was previously assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF") Squad at FBI-Newark. As a Special Agent for the FBI, some of my duties include the investigation of firearms possession by prohibited persons and firearms and narcotics trafficking.

2. I have received trained in various aspects of law enforcement, including the investigation of violent crimes and narcotics-related offenses. During my employment with the FBI, I have been involved in several violent crimes, narcotics, gang, and money laundering-related investigations. In the course of those investigations, I have conducted physical surveillance, executed search warrants, facilitated undercover illicit drug purchases from suspects involved in narcotics trafficking, and reviewed and acted upon the results of the interception of wire communications. In the course of my training and experience, I have become familiar with the practices, methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, the organization of drug conspiracies, and traditional gang methodologies and structures.

3. I am aware of Operation Throne Down and the related case of *United States v.*

*Cecchetelli, et. al.*, 19-CR-10459-RWZ, which is currently pending before this Court. Rather than restate the underlying relevant information about the Almighty Latin King and Queen Nation (the "LATIN KINGS") from that investigation in this affidavit, I have attached the affidavit submitted in support of search warrants obtained in that case (the "Operation Throne Down Affidavit") as Exhibit 1 to this affidavit, which should be considered incorporated into this affidavit by reference.

4. On or about December 4, 2019, as a part of Operation Throne Down, JONATHAN CASIANO, a/k/a "KING LEGEND," a member of the LATIN KINGS, was indicted on a charge of felon in possession of ammunition (Count Seven), in violation of 18 U.S.C. § 922(g)(1). *See United States v. Cecchetelli, et. al.*, 19-CR-10459-RWZ.

5. I am aware of the ongoing investigation of CASIANO and others relating to violations of 18 U.S.C. § 1962(c) and (d) (racketeering activity, and conspiracy to conduct enterprise affairs through a pattern of racketeering activity), 18 U.S.C. § 922(g)(1) (felon in possession of a firearm or ammunition), 18 U.S.C. § 924(c) (use of a firearm during a crime of violence or controlled substance offense), and 21 U.S.C. §§ 841 and 846 (distribution of controlled substances, possession with intent to distribute controlled substances, conspiracy to distribute controlled substances) (hereinafter the "Target Offenses").

6. I submit this affidavit in support of an application for a warrant to seize and search three cellular phones seized from a vehicle used by CASIANO on July 19, 2019 (collectively, the "Target Devices"), as described below and in Attachment A, for the purpose of seizing evidence, fruits, and instrumentalities of the Target Offenses, as described in Attachment B. It is my understanding that the Target Devices were not searched at the time of seizure and remain in effectively the same state as when they were seized. As described below, there is probable cause

to believe that federal crimes were committed, and that the Target Devices contain evidence, fruits, and instrumentalities of the Target Offenses. The cellular phones I am seeking to search are as follows:

    a.    LG cellular telephone, Model LG-SP200, FCC ID ZNFSP200, S/N 902VTFW1870419, seized from a BMW sedan bearing MA Reg. 8NJ534 used by CASIANO on July 9, 2019, further described in Attachment A, currently stored at the Massachusetts State Police Gang Unit West Team Office, 190 Carando Drive, Springfield, MA 01104;

    b.    Alcatel cellular telephone, Model 4044C, FCC ID 2ACCJN012, IMEI 014896003096067, seized from a BMW sedan bearing MA Reg. 8NJ534 used by CASIANO on July 9, 2019, further described in Attachment A, currently stored at the Massachusetts State Police Gang Unit West Team Office, 190 Carando Drive, Springfield, MA 01104;

    c.    Samsung Galaxy S9, FCC ID A3LSMG960U, IMEI 355029091892653, seized from a BMW sedan bearing MA Reg. 8NJ534 used by CASIANO on July 9, 2019, further described in Attachment A, currently stored at the Massachusetts State Police Gang Unit West Team Office, 190 Carando Drive, Springfield, MA 01104.

7.    The facts in this affidavit come from my personal review of records and documents, my training and experience, and information provided to me by fellow agents and task force officers of the FBI, agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives associated with the prior and ongoing investigation of the LATIN KINGS, including Operation Throne Down, officers of the Boston Police Department ("BPD"), New Bedford Police Department, and Massachusetts State Police ("MSP"). This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

**Probable Cause to Believe That Federal Crimes Were Committed**

**I.    BACKGROUND REGARDING CASIANO**

8.    As described in the Operation Throne Down Affidavit, submitted as Exhibit 1 to

this affidavit, CASIANO is a known member of the LATIN KINGS and has been verified to be a member of the Springfield Chapter by historical police reports and records.

9.      On June 3, 2019, CASIANO was convicted in Springfield District Court for possession to distribute Class B, which is a felony that carries a penalty greater than one year in prison (Docket No. 1823CR002031). Additionally, on May 20, 2016, CASIANO was convicted in Hampden Superior Court for possession with intent to distribute Class A, which is a felony that carries a penalty greater than one year in prison (Docket No. 1579CR00659). Further, on September 25, 2009, CASIANO was convicted in Worcester Superior Court for possession with intent to distribute Class A, which is a felony that carries a penalty greater than one year in prison (Docket No. 0813491). As such, CASIANO is prohibited from possessing firearms and ammunition.

10.     CASIANO was captured on various consensual recordings and recorded meetings made by CW-9 from Operation Throne Down with members of the LATIN KINGS.

11.     On March 31, 2019, CASIANO was captured in a recording in which CASIANO rides in a vehicle with CW-9, REY IVAN LORENZANA a/k/a/ "REY REY," and FNU LNU a/k/a/ "PYTHON" traveling from Springfield, Massachusetts to Worcester, Massachusetts. CW-9, LORENZANA, and "PYTHON" are known to investigators as LATIN KINGS members. Investigators know that the purpose of this trip was to attend a LATIN KINGS meeting held in Worcester, Massachusetts on the aforementioned date. During the course of the drive, individuals in the vehicle discussed the affairs of the LATIN KINGS enterprise.

12.     During the Operation Throne Down investigation, CW-9 reported the following regarding CASIANO: on March 11, 2019, that CASIANO was distributing large quantities of heroin in the Springfield, Massachusetts area; on April 2, 2019, that CASIANO had attended a

LATIN KINGS Unity Day[1] party held in Worcester, Massachusetts; and on May 20, 2019, that CASIANO had supplied MICHAEL CECCHETELLI, a/k/a "KING MERLIN," with an unknown quantity of 30 mg Percocet pills.

13. CASIANO also employed telephones to communicate with other members of the LATIN KINGS and participate in the conspiracy. For example, on March 27, 2019, CASIANO is captured on a recorded telephone call with two other LATIN KINGS members discussing the need to call another LATIN KINGS member out as a flake, or a member in bad standing. Additionally, on March 31, 2019, CASIANO is captured on a recorded telephone call discussing the LATIN KINGS chain of command and using the phrase "ADR," a phrase often mentioned between LATIN KINGS members to affirm their commitment to the gang and understood by members as strongly indicative of their LATIN KINGS affiliation. *See* Ex. 1 ¶ 42. Further, on May 17, 2019, CASIANO is captured on a telephone call discussing working with another LATIN KINGS member to gather and post bail money for HECTOR ADORNO, a/k/a/ "KING GORDO," who was similarly charged in Docket No. 19-10459. At the time of this call, ADORNO was incarcerated on then-pending state charges. Consequently, the consensually recorded telephone calls prove that CASIANO employs telephones to communicate with other members of the LATIN KINGS and further the efforts of the criminal enterprise. As a result, the Target Devices are likely to contain evidence of the racketeering conspiracy, as described in Attachment B.

14. Messages sent by CECCHETELLI on March 3, 2019 through Signal, an encrypted messaging service, to another LATIN KINGS member appear to reference CECCHETELLI's recent meeting with CASIANO and CECCHETELLI's instructions to CASIANO to obtain a kilogram of narcotics.

---

[1] As further detailed in the Operation Throne Down Affidavit, the LATIN KINGS Unity Day is a periodic social event during which local and regional members meet and fraternize. Ex. 1 ¶ 40.

## II. JULY 9, 2019 ARREST

15. On July 9, 2019, MSP Gang Unit officers (collectively, "MSP Officers") on patrol in an unmarked car in Springfield, Massachusetts observed a BMW sedan bearing MA Reg. 8NJ534, a plate well known to them based on information provided by multiple confidential informants and a car known to them to frequent the area to distribute narcotics (the "vehicle"). MSP Officers were also aware that the vehicle is registered to CASIANO. Within the previous week, three different confidential informants[2] had informed one of the MSP Officers that CASIANO is known to carry a firearm.

16. While travelling directly behind the BMW sedan, one of the MSP Officers observed the operator of the vehicle texting while driving. The MSP Officer called the Springfield State Police Barracks to request assistance with a marked cruiser for a car stop.

17. An MSP marked cruiser (the "MSP cruiser") approached the vehicle with its emergency lights activated, and the vehicle pulled over and stopped.

18. Based on information that CASIANO, the registered owner of the vehicle, is known to carry a firearm, MSP Officers requested that the CASIANO, the operator and sole occupant of the vehicle, exit the vehicle.

19. CASIANO remained in the driver's seat and ignored verbal commands to exit. MSP Officers moved CASIANO away from the driver's seat area. CASIANO continued to disobey verbal commands and attempted to sit and re-enter the vehicle, which began rolling backwards. An MSP Officer was able to stop the vehicle just before it hit the MSP cruiser.

20. Once the vehicle was secured, CASIANO was handcuffed. As he was being moved away from the vehicle, CASIANO shouted "Baby I'm going to jail." CASIANO was

---

[2] Two of these sources are reliable and have many pending drug and firearm cases in Hampden County.

placed in the back of the MSP cruiser. Law enforcement subsequently found a cellular phone inside the vehicle with the line open, in the middle of a call, with a female individual.

21. CASIANO was pat-frisked and a large amount of cash was found in his wallet, located in his right front sweatpants pocket.

22. While standing outside of the vehicle, MSP Officers observed bundles of small glassine bags consistent in appearance to heroin packaging and a large amount of cash in the pocket map area of the driver's door.

23. MSP Officers entered the vehicle and observed a firearm on the floor of the driver's area at the driver's seat base.

    a. The firearm had a 17-round high-capacity magazine loaded with 15 rounds of 9mm ammunition.

    b. No markings and/or serial numbers were found on the firearm.

    c. A subsequent MSP Report of Examination of Test Firing reported a successful test fire.

24. I am aware that no commercial ammunition is manufactured in the state of Massachusetts. As such, I believe that the 15 rounds of 9mm ammunition recovered on July 9, 2019 necessarily crossed state lines prior to being recovered in Springfield, Massachusetts.

25. CASIANO was advised of his *Miranda* rights while seated in the MSP cruiser. When asked if he had a license to carry a firearm, CASIANO responded that he did not.

26. CASIANO was advised that he was under arrest for firearm and narcotic charges and was transported to the Springfield Barracks, where he was issued a citation for texting while driving.

27. As a result of CASIANO's arrest, the vehicle was searched and the following found:

    a.    Approximately 74 grams of substances consistent in appearance and packaging to cocaine or crack cocaine;

    b.    Approximately 486 small blue pills marked M30 with a weight totaling 63.2 grams, later preliminarily identified as Oxycodone 30 mg tablets;

    c.    Approximately 810 individual unit baggies containing a tan powder consistent in appearance and packaging to heroin;

    d.    A small amount of brown crystal substance consistent in appearance to methamphetamine;

    e.    Approximately 67 tablets marked D25 and G31, later preliminarily identified as gabapentin;

    f.    Three tablets marked Adderall XR30;

    g.    Two electronic scales with powder residue on the measuring surfaces;

    h.    Packaging materials;

    i.    Three cellular telephones (the Target Devices, described above); and

    j.    Approximately $9,880 in cash.

28. CASIANO signed a *Miranda* Rights Warning and Waiver. CASIANO was interviewed and provided a recorded statement, in which he was again advised of his *Miranda* rights. In the interview, CASIANO stated that he had possessed the firearm for approximately one month and that an "associate" had given it to him. Further, CASIANO admitted that he does not have an FID card or license to carry a firearm.

29. On July 10, 2019, CASIANO was charged in Springfield District Court with numerous firearm and drug-related charges. CASIANO was released on bail in the Springfield District Court matter.

30. The items seized on July 19, 2019 were submitted to the MSP Crime Laboratory. I am aware that the MSP Crime Laboratory segregated the evidence seized based primarily on

appearance and/or consistency and conducted independent analyses thereof. An MSP Certificate of Drug Analysis dated September 25, 2019 reported the results of analysis of the evidence seized as follows:

    a. Item 1: off-white rock-like powder, green vegetable matter pieces, and brown debris containing fentanyl, cocaine, 3,4-methylenedioxymethamphetamine, also known as MDMA, and marihuana, including its resin, totaling approximately 2.15 grams;

    b. Item 2: off-white rock-like powder containing cocaine, totaling approximately 49.04 grams;

    c. Item 3: white powder containing cocaine, totaling approximately 7.91 grams;

    d. Item 4: off-white rock-like powder containing cocaine, totaling approximately 2.26 grams;

    e. Item 5: white powder containing cocaine, totaling approximately 0.30 grams;

    f. Item 6: off-white powder containing cocaine, totaling approximately 6.95 grams;

    g. Item 7: 38 white oval tablets imprinted or partially imprinted with "G 31" consistent in markings and appearance with containing gapapentin, totaling approximately 30.89 grams;

    h. Item 8: 30 white oval tablets imprinted or partially imprinted with "D 24" consistent in markings and appearance with containing gapapentin, totaling approximately 25.45 grams;

    i. Item 9: off-white/brown crumb-like powder containing fentanyl, cocaine, and 3,4-methylenedioxymethamphetamine, also known as MDMA, totaling approximately 0.39 grams;

    j. Item 10: 494 light blue round tablets imprinted or partially imprinted with "M (in a box), 30," containing acetyl fentanyl, fentanyl, valeryl fentanyl, cocaine, consisting of 494 tablets totaling approximately 61.53 grams;[3] and

    k. Item 11: 4 light blue round tablet fragments partially imprinted with "30," containing acetyl fentanyl, fentanyl, cocaine, 3,4-

---

[3] 28 of the 494 tablets were tested, representing a 95% confidence level that at least 90% of the population contains acetyl fentanyl, fentanyl, and valeryl fentanyl.

methylenedioxymethamphetamine, also known as MDMA, and delta-9-tetrahydrocannabinol, with the tested tablet fragment totaling approximately 0.03 grams and the remaining 3 tablet fragments totaling approximately 0.04 grams.

31. On December 4, 2019, as a part of Operation Throne Down, CASIANO was federally indicted on a charge of felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1).

**Investigators' Possession of the Equipment**

32. The Target Devices are currently in the possession of the MSP Gang Unit West Team, 190 Carando Drive, Springfield, MA 01104, and are being stored at its facilities, as described in Attachment A. As described herein, MSP Officers seized the Target Devices at the time of CASIANO's July 9, 2019 arrest during a search of the vehicle conducted after MSP Officers observed bundles of small glassine bags consistent in appearance to heroin packaging and a large amount of cash in the pocket map area of the driver's door. The Target Devices were seized and have been lawfully retained by the arresting agency, pursuant to an exception to the warrant requirement. Based upon the nature of the digital devices, it is my understanding that the Target Devices remain in effectively the same state as at the time of seizure, and the content and other information would not have degraded or been altered since the time of the seizure.

33. Based upon my training and experience, and as described in more detail below, individuals often store personal information and data, including images, videos, and conversations via text message or other messaging applications on their cellular phones. Typically, such personal information and data, including images, videos, and text messages between cellular phones, are retained by default unless deleted manually or via an enabled auto-delete feature. As a result, I believe that the Target Devices presently contain the same information and data, including any images, videos, and text messages, as existed on the date of CASIANO's arrest, as

described above.  Consequently, the probable cause that the Target Devices contain evidence of the Target Offenses, which existed at the time of the arrest and seizure, is not subject to the same analysis for staleness that typically exists for locations, persons and premises.  The delay in seeking this search warrant is attributable to a variety of factors, including: the necessity of secrecy relating to the federal investigation and safety of the cooperating witnesses; the size and scope of the LATIN KINGS investigation and the related searches, arrests, and processing of evidence derived from the December 2019 takedown; and the ongoing Covid-19 pandemic, which complicated the ability for federal law enforcement to arrange for the execution of the instant search warrants.

## Probable Cause to Believe That The Target Devices Contain Evidence, Fruits, And Instrumentalities

34. As discussed above, the Target Devices are currently being stored by MSP at its facilities as described in Attachment A.  From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that they have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the investigators' possession.

35. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  LG and Samsung phones, such as two of the three Target Devices, are types of smartphones.  Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among

other things, evidence that reveals or suggests who possessed or used the device.

36. As a general matter, from my training, experience, and information provided to me by other agents, I am aware that the LATIN KINGS carry out, communicate about, and store records regarding their daily activities on cellular phones. These tasks are frequently accomplished through sending and receiving e-mail, text messages, and other forms of internet based messages; scheduling activities; arranging travel; purchasing items; searching for information on the internet; accessing personal accounts including banking information and social media accounts; and creating and storing images and videos of the LATIN KINGS enterprise's membership, movements and activities.

37. Specific to this investigation, the LATIN KINGS members, chapters, and leadership structure described in Exhibit 1 conduct numerous aspects of the racketeering activity over the phone. Cellular phones are used by each and every member of the LATIN KINGS for all manner of activity, including coordination of meetings, communication of enterprise activity, discussion and planning of racketeering activity, and the capture and transmission of photographs and videos related to the LATIN KINGS enterprise. Exhibit 1 contains numerous instances of violence being coordinated, discussed and documented by the LATIN KINGS through cellular phones. The Operation Throne Down Affidavit and investigation make clear that email, social media, pictures and video distributed through social media, and text messages are means by which the members of LATIN KINGS stay in communication, confirm and coordinate issues and directives amongst themselves and with leadership, and document aspects of the enterprise and their crimes for posterity.

38. Based upon my training and experience and evidence developed through this investigation, I know that the LATIN KINGS members under investigation routinely use the

12

internet and cellular phones to communicate and coordinate the enterprise's operations and its racketeering activity, document information and membership in the LATIN KINGS, photograph and document members and meetings, popularize and promote the enterprise and the various celebrations held by the enterprise. As such, the digital footprint of the LATIN KINGS is extensive and growing, and, therefore, it is reasonable to believe that digital devices owned by members of the LATIN KINGS will contain evidence of the LATIN KINGS enterprise. As such, the Target Devices used by CASIANO constitute instrumentalities of the Target Offenses and will contain evidence of the Target Offenses.

39. Through my training, experience, debriefings with numerous drug traffickers, and consultation with other special agents and law enforcement officers, I have learned the following information about the practices of those involved in the trafficking of controlled substances:

   a. Individuals involved in drug trafficking maintain documents and other records related to their illicit business at their residence and locations associated with them, including stash houses. Specifically, individuals involved in drug trafficking often maintain ledgers in order to keep track of the purchasing, storage, distribution, and transportation of drugs and/or the laundering of the proceeds of their drug sales. Even after the drugs are sold and/or used, documentary records and ledgers are often maintained for long periods of time to memorialize past transactions and to maintain the names, telephone numbers, and contact information for suppliers, customers, and co-conspirators. In my experience, premises used by drug traffickers (including stash houses) often contain documents and articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

   b. Individuals involved in drug trafficking must often rely on others to obtain their drugs and/or the materials necessary to manufacture/distribute their drugs. Frequently, drug traffickers maintain evidence of the identities of these co-conspirators at premises associated with them and will maintain these types of materials even after drugs are sold or used.

   c. Individuals involved in drug trafficking often store articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

13

      d.      Individuals involved in drug trafficking often take photographs of themselves, their associates, their property, and their controlled substances. Drug traffickers often maintain these photographs at premises associated with them even after drugs are sold or used. Therefore, I am requesting permission to search for and to seize photographs that law enforcement agents determine to be of evidentiary value.

      e.      Individuals involved in drug trafficking use various tools, instruments, materials and drug paraphernalia to facilitate their trafficking, including weighing the drugs, packaging the drugs, and cutting the drugs. These types of materials include, but are not limited to: scales, cutting materials, and packaging materials. These types of materials are often maintained at locations associated with drug traffickers even after drugs are sold or used. I am also aware that it is generally a common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences or premises associated with them, even after drugs are sold or used.

40. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who engage in the Target Offenses typically use cellular telephones to communicate with each other, the suppliers of controlled substances and firearms, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that persons who illegally possess and use firearms and narcotics, and commit acts of violence, regularly keep records of their illegal activities and the coordination of their illegal activity. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific descriptions of firearms, controlled substances and ammunition to be obtained for specific customers, and communications between persons coordinating the possession of weapons, ammunition and commission of violent acts with the weapons.

41. Individuals engaged in illegal firearms activities often take photographs of the

firearms and transmit those photographs to their coconspirators' rivals, customers, and the general public in order to expand their notoriety and reputation. Records of firearms and narcotics trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone. In this case, the enterprise and racketeering conspiracy also will have generated extensive digital presence on the Target Devices. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on cellular telephones.

42. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers and cellular phones to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

43. Additionally, I know that members of racketeering conspiracies, and dealers in controlled substances often use cellular telephones in order to communicate quickly and economically with their coconspirators, suppliers and customers via the internet. I am also aware that individuals frequently use cellular telephones and computers to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to dealing in controlled substances and illegal firearms trafficking, including amounts, prices, makes, models, prices, caliber and other related information; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data

on a cellular phone can provide valuable evidence as to the locations where conspirators met, and acts were taken in furtherance of the Target Offenses.

44. Based upon my training and experience, and information provided to me by others involved in the forensic examination of cellular telephones, I know that electronic data on cellular telephones and computers can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone or computer; within volatile memory, such as RAM; or on removable media, such as memory cards.

45. Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

  a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

  b. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

  c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

  d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## CONCLUSION

46.     Based on the information described above, I have probable cause to believe that CASIANO has violated 18 U.S.C. § 1962(c) and (d) (racketeering activity, and conspiracy to conduct enterprise affairs through a pattern of racketeering activity), 18 U.S.C. § 922(g)(1) (felon in possession of ammunition), 18 U.S.C. § 924(c) (use a firearm during a crime of violence or controlled substance offense), and 21 U.S.C. §§ 841, 846 (distribution of controlled substances, possession with intent to distribute controlled substances, conspiracy to distribute controlled substances).

47.     Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the Target Devices described in Attachment A.

Signed electronically and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on November 30, 2020.

><i>/s Mercedes Casella</i>
>Special Agent Mercedes Casella
>Federal Bureau of Investigation

Electronically subscribed and telephonically sworn to
me on November 30, 2020

Marianne B. Bowler (USMJ)
HON. MARIANNE B. BOWLER
United States Magistrate Judge